IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

BELINDA MADDOX GUNTER,       )
                             )
          Plaintiff,         )
                             )
     v.                      )       CIVIL ACTION NO. 1:10CV967-SRW
                             )                   (WO)
MICHAEL J. ASTRUE,           )
Commissioner of Social Security,  )
                             )
          Defendant.         )

## MEMORANDUM OF OPINION

Plaintiff Belinda Maddox Gunter brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a decision by the Commissioner of Social Security ("Commissioner") denying her application for a period of disability and disability insurance benefits under Title II of the Social Security Act.  The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Upon review of the record and briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be affirmed.

## BACKGROUND

Plaintiff completed eighth grade in 1981; she began but did not finish ninth grade. (R. 147).  Plaintiff was not in special education classes, but she performed poorly in her regular classes. She did, however, attain scores of 70 or above in academic courses of science, math and social studies for one semester each during her seventh and eighth grade years.  (R. 9, 11, 137).  Plaintiff testified that "they kept on passing [her] on" even though

there were things she could not do and that "[n]obody seemed to want to help." (R. 11). Plaintiff also testified that she is unable to read or write. (R. 11).[1]  She has worked as a short-order cook and as a garment inspector, both semi-skilled jobs.  (R. 34, 174).

Plaintiff filed the present application for disability insurance benefits on August 30, 2007, when she was forty-two years old, alleging that she became disabled on May 15, 2008, due to "Ld/slow learner, nerves, [and] headaches." (R. 113-20, 168).  She reported that she "had problems with remembering the instructions that were given to [her,] [f]ollowing those instructions and learning to do the tasks [she] was required to know in order to hold down a job."  (R. 168).  She stated that she is not able to handle any job-related pressure or responsibilities and that she is "very paranoid and just cannot cope with the day to day activities required in a public environment." (Id.).

After plaintiff's claim was denied initially, she requested a hearing before an ALJ, which was held on August 26, 2009.  (R. 5-41, 61-70).[2]  The ALJ issued a decision on October 8, 2009, concluding that plaintiff has severe impairments of "anxiety disorder and

---

[1]  The disability report completed in support of plaintiff's application for benefits indicates that she is able to "read and understand English" and to "write more than [her] name in English[.]" (R. 167).  It is not clear whether plaintiff or her husband provided this information to the DDS interviewer.  (See R. 140).

[2]  Plaintiff also filed an application for supplemental security income (see R. 121-24); the decision on that claim is not before the court for review, as there is no final decision of the Commissioner after a hearing on the Title XVI claim.  See 42 U.S.C. § 405(g).  The transcript before the court does not include copies of the administrative action on the SSI claim.  By notice dated June 29, 2009, the ALJ identified the issue before him as plaintiff's entitlement to a period of disability and disability insurance benefits (Exhibit 8B, R. 89-90, 94-95); his written decision indicates that it pertains to plaintiff's Title II application. (R. 47, 58).

depressive disorder and an inability to read and write from an undiagnosed cause[.]" (R. 49). The ALJ determined that plaintiff's impairments, considered in combination, did not meet or medically equal a listing. (R. 51). He found that, as a result of her impairments, plaintiff is limited to light work with no reading requirement, in a low-stress work environment with few changes in the workplace and no more than occasional simple decision-making, only occasional contact with the general public, and brief superficial contact with coworkers. (R. 53). The ALJ concluded that, while plaintiff's RFC precluded performance of her past relevant work, there are other jobs existing in significant numbers in the national economy that plaintiff can perform and, therefore, that plaintiff was not disabled from her alleged onset date through December 31, 2008, her date last insured. (R. 56-58). Plaintiff sought review of the ALJ's decision by the Appeals Council, which – after considering additional evidence submitted by the plaintiff – denied review on September 22, 2010, leaving the ALJ's unfavorable decision as the final decision of the Commissioner. (R. 1-4). Plaintiff commenced the present appeal on November 12, 2010. (Doc. # 1).

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed. The court does not reweigh the evidence or substitute its judgment for that of the Commissioner. Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings. Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145

(11th Cir. 1991). Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion." Cornelius, 936 F.2d at 1145. Factual findings that are supported by substantial evidence must be upheld by the court. The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. Davis, 985 F.2d at 531. If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed. Cornelius, 936 F.2d at 1145-46.

## DISCUSSION

Plaintiff contends that the ALJ erred by failing to accept her IQ scores as valid and, as a result, in concluding that her impairments did not satisfy Listing 12.05C. Plaintiff further argues that the ALJ erred in assessing her credibility and in relying on vocational expert testimony based on a hypothetical question that did not represent her limitations. She contends that – since the ALJ concluded that plaintiff could not perform her past relevant work as a garment inspector – he erred by finding that she could perform the job of "inspector" identified by the vocational expert in response to the ALJ's hypothetical question.[3] Finally, plaintiff maintains that the Appeals Council erred in declining to review

---

[3] Plaintiff argues that, in his statement of the issues, "[t]he ALJ erred in basing his decision on the 'hypothetical' opinion of vocational expert, Joe Mann that there are a significant number of jobs existing in the national economy that the claimant could perform, while also holding that she could NOT perform them." (Doc. # 13, p. 6). In the argument portion of her brief, plaintiff points more specifically to the ALJ's findings at steps four and five of the sequential analysis regarding the job of "inspector." (Id., pp. 12-13).

the ALJ's decision, in light of the additional evidence submitted to the Appeals Council.

Listing 12.05C

For a claimant to be found disabled under Listing 12.05, she must have "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period," and, in addition, meet one of the four requirements described in subparagraphs A through D. See Listing 12.00A. Listing 12.05C requires "a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." The standard for an "additional and significant" limitation is the same as for a "severe" impairment under 20 C.F.R. 404.1520(c) or 416.920(c).[4]

Plaintiff submitted evidence to the ALJ that when she was tested by psychometrist Jamie Abshire on February 15, 2008, her WAIS-III scores resulted in a verbal IQ of 62, a performance IQ of 69 and a Full Scale IQ of 62 – scores that fall within the range of mild mental retardation. (Exhibit 10F). If these IQ scores were accepted as a valid indication of

---

[4] Under earlier versions of the regulation as interpreted by the Eleventh Circuit, the "additional and significant" standard was lower than the "severe" standard. See Edwards v. Heckler, 755 F.2d 1513, 1515-16 (11th Cir. 1985); see also Davis v. Shalala, 985 F.2d 528, 531-32 (11th Cir. 1993). However, the Commissioner modified the introductory paragraph 12.00A and Listing 12.05C to clarify that the additional physical or mental impairment must be "severe." See 65 Fed. Reg. 50,746 at 50,754 (Aug. 21, 2000)("In final listing 12.05C ... we used the word 'an' before the word 'additional' to clarify that the additional impairment must be 'severe' in order to establish 'an additional and significant work-related limitation of function."); id. at 50772 ("We have always intended the phrase [significant work-related limitation of function] to mean that the other impairment is a 'severe' impairment, as defined in §§ 404.1520(c) and 416.920(c)... . Therefore, ... we revised the fourth paragraph of final 12.00A, which explains how we assess the functional limitations of an additional impairment under listing 12.05C.").

plaintiff's intellectual ability, plaintiff would be entitled to a finding of disability under Listing 12.05C, because the ALJ found that she has other severe impairments. However, even "[a] valid IQ score is not conclusive of mental retardation when the IQ score is inconsistent with other evidence in the record about claimant's daily activities." Outlaw v. Barnhart, 197 Fed. Appx. 825, 827 (11th Cir. 2006)(citing Popp v. Heckler, 779 F.2d 1497, 1499 (11th Cir. 1986)). While the ALJ need not accept the IQ scores as conclusive, he is required to consider the IQ testing results in conjunction with other evidence of record, including medical evidence and the claimant's daily activities, in determining whether the claimant suffers from mental retardation. Popp, 779 F.2d at 1500.

In this case, the ALJ found that the IQ scores were not valid (R. 51), stating a number of reasons for his conclusion that they were not indicative of plaintiff's actual level of mental functioning (R. 50-51). Some of his reasons, as plaintiff argues, do not have merit (*e.g.*, the fact that plaintiff maintains an intimate relationship with her husband, a police officer who does not suffer from retardation). However, the ALJ also identified valid evidence weighing against a finding of mental retardation. The ALJ noted that while plaintiff performed poorly in school, she was not in special education and she occasionally attained grades greater than 70 in academic courses. (R. 50-51). This is supported by plaintiff's education record from junior high school. (R. 137).[5] The ALJ also pointed to plaintiff's work history, noting that

---

[5] Plaintiff argues that there is no evidence of record regarding whether she was in special education. (Doc. # 13, p. 1). However, plaintiff's school transcript does not affirmatively indicate that she was in special education classes. Further, the report of plaintiff's consultative psychological examination states that she "attended regular classes, but states she never knew anything and was

she "succeeded at a number of jobs that were lost for reasons other than an inability to understand and perform the requirements of the job[.]" (R. 50).

Plaintiff notes that the ALJ "never discussed 'success' in any job with her, or the other factors involved in her work environment[,]" pointing out that, at her job at Pizza Hut, plaintiff had the support of all of her sisters. (Doc. # 13, p. 8). Significantly, however, the record demonstrates that plaintiff worked in the semi-skilled position of garment inspector for three and a half years (R. 34, 174), and that she left her most recent garment inspector job because the factory closed (R. 18). Plaintiff held a number of jobs as a cook – also semi-skilled work (R. 34, 174) – other than at Pizza Hut. She testified that she quit her job as a cook at a grocery store after about six months because, on the day after she called in sick on one occasion, her supervisor "jumped all over [her] and it hurt [her] feelings[.]" (R. 13-14). She testified that she left her job as a cook at a nursing home after about four months because she "was the only white person there that worked in the kitchen and they treated [her] terribly." (R. 14-15). Thus, the record supports the ALJ's conclusion that plaintiff "succeeded" in these jobs to the extent that she was able to perform the requirements of the positions, and left for reasons other than her inability to understand or perform those requirements.

The ALJ further observed that plaintiff manages a home and drives a car. (R. 50). Plaintiff reported that her son and husband depend on her "to wash their clothes, clean the

socially promoted." (R. 242). The ALJ's conclusion that plaintiff attended regular classes and attained scores above 70 on occasion is supported by the record.

house and cook for them[,]" that she can mow the grass, and that her condition does not limit her in cooking and preparing meals or performing household chores. (R. 142-44). Although plaintiff prefers to have her mother or husband accompany her to the grocery store because she does not "do math very well," plaintiff's husband reported that plaintiff shops in stores for food, clothing and household items. (R. 144, 152). Plaintiff is also able to drive a car. (R. 145, 152). The ALJ further relied on evidence that, in all of plaintiff's "other doctor visits, no doctor has noted that she appears to have mental retardation. (R. 50). This observation is supported by the medical record, including the record of plaintiff's treatment at South Central Alabama Mental Health. (See Exhibits 1F, 4F, 5F, 6F, 11F; see also Exhibits 12F, 13F, 14F (SCAMH records describing plaintiff as "poorly educated" and "illiterate" (R. 310) but making no diagnosis of or reference to mental retardation or intellectual deficit); R. 308 (August 2008 SCAMH intake evaluation assessing mental illness and indicating that there is no "dual diagnosis" of mental illness and mental retardation); R. 391, 399 (no mental retardation assessed in August 2009 SCAMH annual update)).

Accordingly, the court concludes that the evidence outlined above is sufficient to support the ALJ's determination that plaintiff does not satisfy the requirements of Listing 12.05C and, further, that this determination is supported by substantial evidence of record. See Outlaw, 197 Fed. Appx. at 827, 827 n. 1 (plaintiff's adult IQ scores were "not consistent with his daily activities" in view of plaintiff's history of employment in semi-skilled positions; plaintiff "had worked for several years as an adult as a van driver, a security

8

guard, and in the shipping and receiving department at a pecan plant").

<u>The Credibility Assessment and the Vocational Expert's Testimony</u>

In the Eleventh Circuit, a claimant's assertion of disability through testimony of pain or other subjective symptoms is evaluated pursuant to a three-part standard. "The pain standard requires '(1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.'" <u>Dyer v. Barnhart</u>, 395 F.3d 1206, 1210 (11th Cir. 2005)(quoting <u>Holt v. Sullivan</u>, 921 F.2d 1221, 1223 (11th Cir. 1991)).  If this standard is met, the ALJ must consider the testimony regarding the claimant's subjective symptoms.  <u>Marbury v. Sullivan</u>, 957 F.2d 837, 839 (11th Cir. 1992).  Although the ALJ is required to consider the testimony, the ALJ is not required to accept the testimony as true; the ALJ may reject the claimant's subjective complaints. However, if the testimony is critical, the ALJ must articulate specific reasons for rejecting the testimony. <u>Id</u>.[6]  "The

_____

[6] <u>See also</u> Social Security Ruling 96-7p, 61 Fed. Reg. 34483-01 (July 2, 1996):

When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements.  The finding on the credibility of the individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility.  The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision.  It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible."  It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms.  The determination or decision must contain specific reasons for the finding on

credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable [the court] to conclude that [the ALJ] considered [the claimant's] medical condition as a whole." Dyer, *supra*, 395 F.3d at 1210 (citations and internal quotation marks omitted).

At the administrative hearing, plaintiff testified that she takes Lexapro and Xanax. In response to the ALJ's question about how well the medications controlled her symptoms, plaintiff responded, "Well when it comes up bad weather nothing does. And if somebody makes me mad or, it doesn't do any good either." (R. 19). She testified, "When it rains I'm scared. I have to go somewhere to feel safe. I have to be with somebody and out of my trailer to feel safe." The ALJ asked plaintiff whether she felt safe inside the various shops or buildings where she worked during bad weather; plaintiff responded, "No, sometimes I would leave there because I wouldn't feel safe there and I would go somewhere like to my sister[']s or down to my sister's law office to feel safe." (R. 19-20). In response to questioning by her attorney, plaintiff testified that she does not like the dark and does not drive in the dark. She stated that her husband drove her to the hearing and she rode in a reclined position, with a pillow over her face, because she is "just concerned about having a wreck." (R. 22). She does not attend her son's medical appointments in Birmingham because she "can't get in the car to go" and is afraid that "something is gonna happen." (R.

---

credibility, supported by the evidence in the case record, and must be sufficiently
specific to make clear to the individual and to any subsequent reviewers the weight
the adjudicator gave to the individual's statements and the reasons for that weight.

22).

In response to her attorney's question about whether she "drives a car sometimes around town," plaintiff responded that she does so when the weather is bad, and she goes to her sister's house and stays there. Sometimes, she goes to her mother's house. (R. 21). She testified that she hears "voices in [her] head" and that the voice tells her "if I just go ahead and kill my son and kill myself then I won't have to worry about it." She hears the voice "[e]very day." (R. 23). She stated that she also "sees things" that are not there "[e]very day of [her] life."[7] Sometimes she sees things on the ceiling at night. (R. 24). Sometimes, when she is under stress, she shakes and cries and sometimes says that she wants to kill herself. She has problems remembering things and does not "even want to get out of the bed." Her situation has grown worse over the years. She suffered sexual abuse and some physical abuse as a child and as a young adult; for some time, she could not remember those events. She testified that "I always wanted to just forget about what happened back then but it seems like it's coming back." (R. 25-26). She does not stay at home by herself and usually goes to her sister's home. She testified that she would not be able to drive herself to work and that, if her husband drove her to work, he would have to come get her if it stormed or if they "put [her] under pressure to get on the phone or take an order." (R. 27). She does not socialize with friends. (R. 27-28).

---

[7] Plaintiff later clarified that she has had the visual hallucinations for about three or four years and has heard voices in her head for about five years but that these have been getting worse. (R. 28-29).

11

Plaintiff contends that the ALJ erred in failing to find her testimony regarding her symptoms to be "entirely credible," in view of the record as a whole. (Doc. # 13, pp. 10-12). The ALJ found that the evidence satisfied the requirements of the pain standard – *i.e.*, "that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms[.]" (R. 54). However, the ALJ concluded that plaintiff's allegations regarding "the intensity, persistence, and limiting effects" of her symptoms were not fully credible. (Id.). The ALJ credited plaintiff's testimony of anxiety, panic attacks and depression to a large extent, finding that she "can only occasionally have contact with the general public and brief superficial contact with co-workers" and that she requires "a low stress work environment with few changes in the workplace and no more than occasional simple decision-making." (R. 53). However, he found that her symptoms are not as severe as alleged, stating a number of reasons for this conclusion. (R. 54-55).

The ALJ observed that – except for a single instance in February 2005[8] – the record contains no mental illness diagnosis until August 2008. He concluded that plaintiff's failure to seek mental health treatment until August 7, 2008 – two years after her alleged onset date – "suggests that the claimant's mental illness was not so severe as to require her to seek

---

[8] On February 4, 2005, plaintiff sought treatment at the emergency room for chest pain and dizziness, and she was admitted overnight for evaluation after she "deferred referral to cardiology." (R. 212-21). In a February 7, 2005, visit to her physician at Enterprise Medical Clinic, she complained of shortness of breath, chest pain, palpitations, and left arm pain. After reviewing the hospital records, her doctor diagnosed anxiety with panic attacks and prescribed Effexor and Xanax. (R. 234).

treatment until that date." (R. 54, 55; see Exhibits 4F, 11F, 12F). The ALJ also observed that treatment notes for plaintiff's office visits to Enterprise Medical Clinic in 2007 and 2008 for other medical problems include no indication of psychological symptoms and, on a couple of these visits, expressly indicate no abnormalities as to the psychological portion of the examination. (R. 55; R. 228-29, 282-83, 288). The ALJ further noted that – again, with the exception of the February 2005 ER visit – plaintiff did not seek treatment at an emergency room or require inpatient treatment for psychological symptoms. (Id.). He also reasoned, with regard to plaintiff's allegations of persistent daily auditory hallucinations telling her to kill herself and her child, that plaintiff's treatment records do not indicate that her doctors modified her medication regimen in an attempt to overcome such hallucinations. (R. 55; see Exhibits 12F-14F).[9]

---

[9] Plaintiff testified that she sees a mental health counselor and gets prescriptions from the doctor. She stated that the doctor increased her Lexapro to two pills a day "about four months or [maybe] longer" before the hearing but that, while it calms her nerves, it did not stop the hallucinations. She further testified that her doctor had not changed the dosage of her other medications or tried her on different medications for short periods of time. Plaintiff stated that when she told her mental health provider about hearing voices telling her to kill herself and her son, "[t]hey just tell [her] not to do it." (R. 29-30). Her treatment records from South Central Alabama Mental Health indicate that plaintiff reported hallucinations on initial intake in August 2008 (R. 311, 326). In plaintiff's monthly counseling sessions from intake through July 2009, however, her counselor marked "N/A" in the section of the treatment note for recording thought or perceptional disturbances, including hallucinations (R. 303, 304, 325, 334, 335) for most visits and made no annotation at all in that section on one occasion. (R. 333). On January 29, 2009 – a month after plaintiff's date last insured – the SCAMH staff psychiatrist evaluated the plaintiff and indicated that plaintiff's thought content was "Normal," making no annotation in the space for "Hallucinations." (R. 329). She noted plaintiff's depressed mood and wrote, "Pt has negative thoughts about herself. Feels depressed and sometimes suicidal." (Id.). In a treatment note for August 3, 2009, submitted to the Appeals Council but not to the ALJ, plaintiff's counselor noted "Hallucinations" and "Paranoid." (R. 415). However, no hallucinations were noted in mental status evaluations in September, October or November 2009. (R. 354 ("N/A"), 355 (suicidal thoughts), and 356 (slightly paranoid)).

As to plaintiff's alleged limitations in driving, the ALJ observed that plaintiff did not indicate that she had lost any job because she could not drive to it and, also, that she drives herself to the homes of family members even when the weather is adverse, and also drives to the store.  (R. 55; see R. 21 (plaintiff's testimony that she drives to her sister's house when the weather is bad); see also R.141, 144,152,162, 141 (plaintiff she is "very afraid to drive in rain or the dark" but goes to the grocery store and, because of her "poor reading and writing," tries to get her husband or mother to go with her when they are able).  As noted above, the ALJ credited plaintiff's testimony to a large extent, including significant limitations in her RFC. The reasons articulated by the ALJ are adequate to support his decision not to credit plaintiff's allegations regarding her symptoms fully.  Those reasons are supported by substantial evidence of record and, accordingly, the ALJ did not commit reversible error in assessing plaintiff's credibility.

Plaintiff also contends that the VE's testimony assumes "no absenteeism," an attendance rate that plaintiff cannot attain, in view of her impairments.  She points to the VE's testimony that a person who must leave work three times a month due to panic attacks cannot maintain competitive employment.  (Doc. # 13, p. 12).  She argues that she cannot "maintain an absentee rate below three absences per month. much less of zero" and, therefore, that the hypothetical question to the vocational expert does not describe her limitations.  (Id.).

However, the court does not read the VE's testimony to be that a hypothetical

individual with the limitations identified by the ALJ can maintain employment only if there is "no absenteeism" whatsoever.  (See R. 34-39).  Additionally, as noted above, the ALJ did not credit plaintiff's testimony fully as to her symptoms.  As the Commissioner argues, the ALJ need include in his hypothetical only those limitations that he finds are supported by the record.  See Forester v. Commissioner of Social Security, 2012 WL 45446, *3 (11th Cir. Jan. 10, 2012)("The ALJ is not required to include findings in the hypothetical that the ALJ has found to be unsupported.")(unpublished opinion)(citing Crawford v. Commissioner of Social Security, 363 F.3d 1155, 1162 (11th Cir. 2004).  Because he did not credit plaintiff's testimony fully regarding her driving and her panic attacks, the ALJ was not required to include all of the limitations plaintiff alleged in the hypothetical he posed to the vocational expert.

Plaintiff's past relevant work includes the job of garment inspector; plaintiff's work history report indicates that she performed this job for several years, from January of 1994 through June of 1997.  (R. 174, 176; see also R. 17-19).  The vocational expert testified at the hearing that the job of "[g]arment inspector is light and is also semi-skilled having an SVP of 3." (R. 34).  As plaintiff argues, the ALJ determined that plaintiff cannot perform her past relevant work. The ALJ found that plaintiff is limited to occasional simple decision-making, with few changes in the workplace and no reading. (R. 53). He reasoned that, "[s]ince the past relevant work is at the semi-skilled level, the claimant does not retain the ability to return to the work without training" and, accordingly, that the demands of

15

plaintiff's past relevant work exceed her residual functional capacity. (R. 56). At the hearing, the vocational expert testified that – while plaintiff's past work was at a semi-skilled level – "[t]here are a variety of light, unskilled inspecting positions. One example is DOT code 712.684-050. I've estimated in Alabama approximately 800 light, unskilled inspecting positions and there are more than 10,000 in the national economy." (R. 35). The VE further testified that these jobs would not be precluded by limitations to only occasional contact with the general public and a low-stress environment with few changes in the work place and only occasional simple decision-making. (R. 36). The ALJ relied on this testimony – along with the VE's testimony regarding other unskilled jobs – in his step 5 analysis. Contrary to plaintiff's argument, there is no inconsistency in the ALJ's conclusion that, while plaintiff can no longer perform the requirements of her past relevant semi-skilled work as a garment inspector, she remains capable of performing inspector jobs at the unskilled level.

<u>The Appeals Council's Consideration of New Evidence</u>

After the ALJ rendered his decision, plaintiff submitted additional evidence to the Appeals Council. (<u>See</u> Exhibits 21F, 22F and 28F).[10] Plaintiff asserts that the Appeals Council wrongly denied review. The Appeals Council "may deny review if, even in the light of the new evidence, it finds no error in the opinion of the ALJ." <u>Pritchett v. Commissioner,</u>

---

[10]  The Appeals Council noted that it considered, in addition to a letter from plaintiff's counsel, Exhibits 21F, 22F and 28F. (R. 4).  A number of additional exhibits that were not before the ALJ, designated 15F through 20F and 23F through 27F, are included in the administrative transcript; those exhibits are duplicates of records contained within Exhibit 28F.  Exhibits 21F and 22F are also duplicates of records included within Exhibit 28F.

Social Security Administration, 315 Fed. Appx. 806, 814 (11th Cir. 2009)(unpublished opinion)(citing Ingram, 496 F.3d at 1262).  Plaintiff submitted records of her additional treatment at SCAMH during the period from August 2009 through November 2009, including documentation of plaintiff's annual update evaluation in August 2009, a year after she began treatment with SCAMH.  (Exhibit R. 354-59; 377-405).  The additional evidence also includes an undated medical source opinion signed by plaintiff's counselor at SCAMH and also by Sharon Brown, Ph.D., "Consultant Clinical Psychologist," indicating that plaintiff has marked or extreme limitations in all rated mental functions.  (R. 361-63).[11]  The Appeals Council concluded that the new evidence submitted by plaintiff "did not provide a basis for changing the Administrative Law Judge's decision."  (R. 2).

The additional medical records include an August 3, 2009, form completed by plaintiff for her annual update evaluation, identifying her symptoms. As in her initial intake evaluation, plaintiff reported hallucinations. (R. 379).  Plaintiff checked boxes indicating that she experiences all but sixteen of the 63 "functional deficits" listed on the form.  (R. 380-81).

---

[11]    Although she was the clinic director and reviewed and approved plaintiff's counselor's intake and annual update assessments and treatment plans, there is no indication in the record that Dr. Brown ever personally evaluated the plaintiff at any time.  See Exhibits 12F, 13F, 14F and 28F. Thus, she is not plaintiff's treating psychologist. See 20 C.F.R. § 404.1502 ("*Treating source* means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.  Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s).")(italics in original).

As the Commissioner argues and as discussed above, however, the ALJ found plaintiff's testimony regarding her symptoms to be less than fully credible.

Plaintiff's counselor's notes for the monthly sessions include his handwritten summary of plaintiff's reports of her symptoms and a mental status examination. In the treatment notes provided to the ALJ for the period from August 2008 to July 2009, and in those provided to the Appeals Council for the period from August 2009 to November 2009, the counselor's mental status evaluations always reflect that plaintiff's mood is anxious, her orientation normal and her appearance and affect appropriate. (R. 303-04, 325-26, 328, 333-35, 336). Plaintiff's sleep was reportedly fair from August through October 2008 and, in November, she reported hypersomnia. (R. 303-04, 325-26). Beginning in March 2009 – two months after her date last insured – plaintiff consistently reported her sleep as poor. (R. 328, 333-35, 354-56, 358-59). In the records before the ALJ, the counselor noted "thought or perceptional disturbances" only once; he recorded plaintiff's reported hallucinations at the intake appointment. (R. 326). In the treatment notes submitted to the Appeals Council, the counselor noted "thought or perceptional disturbances" of hallucinations and paranoia at plaintiff's annual update appointment in August 2009 (R. 359), slight paranoia in September 2009 (R. 356), and suicidal thoughts in October 2009 (R. 355). The counselor did not always assign GAF scores. However, those he did assign generally reflect his impression that plaintiff's level of functioning deteriorated, with plaintiff's scores remaining in the low 40s until March of 2009, dropping to 38 in May of 2009, to 34 in August of 2009, and to 20 in

October of 2009 (R. 303-04, 325-26, 328, 335, 355). The mental status evaluation conducted closest in time to plaintiff's date last insured occurred on January 29, 2009, a month after plaintiff's date last insured. On that date, plaintiff was evaluated by the SCAMH staff psychiatrist. The psychiatrist's "Interview Notes" state, "Pt has negative thoughts about herself. Feels depressed and sometimes suicidal." In her evaluation of plaintiff's current mental status, the psychiatrist noted no abnormalities other than a depressed mood. For "Suicidal Estimate" – which allowed responses of ideation, threats, or attempts – the doctor marked "None Evident." (R. 329).

Upon careful review of the additional treatment records, the court concludes that they reflect a deterioration in plaintiff's mental status occurring after her date last insured. However, the records provide no additional insight into plaintiff's mental condition before her date last insured, and do not demonstrate that the ALJ erred in assessing plaintiff's functional capabilities during the relevant time period. Cf. Mackay v. Astrue, 2011 WL 6753848, 13 n. 8 (N.D. Ill. 2011)("The Seventh Circuit has recognized that worsening of a claimant's condition after the date last insured does not provide a basis for granting benefits during the relevant time period.").[12]

In the mental source opinion form plaintiff provided to the Appeals Council, counselor Walker and Dr. Brown assert that plaintiff has marked and extreme limitations in

---

[12] For some progressive diseases, post-DLI evidence may very well provide a basis for reaching a conclusion about the claimant's condition before the date last insured. This is not such a case.

her ability to understand, remember and carry out instructions due to her history of depression, extreme anxiety and panic attacks and because she is illiterate and has limited coping skills. (R. 361). They indicate that she has marked and extreme limitations in her ability to interact appropriately with supervisors, co-workers and the public, citing her history of "depression, anxieties and panic attacks to the point she can not sustain employment[.]" They observe that she is poorly educated and illiterate. (R. 362). When asked to "[i]dentify the factors (*e.g.*, the particular medical signs, laboratory findings or other factors described above)"[13] that support their assessment, they respond "factors are longstanding – chronic depression, anxieties – panic attacks[.]" In item 4, the form states, "The limitations above are assumed to be your opinion regarding current limitations only. However, if you have sufficient information to form an opinion within a reasonable degree of medical or psychological probability as to past limitations, on what date were the limitations you[] found above first present?" Walker and Brown responded, "Abuse by Brother at age of 6 – Severe abuse by 1st Husband." (R. 362). They express their opinion that plaintiff cannot manage her own benefits. (R. 363).

The opinions expressed by counselor Walker and Dr. Brown regarding plaintiff's inability to sustain employment are, as the Commissioner argues, opinions on an issue reserved to the Commissioner, rather than medical opinions that the Commissioner must

---

[13] The form instructs the medical source that the opinion "should be based on your findings with respect to medical history, clinical and laboratory findings, diagnosis, prescribed treatment and response, and prognosis." (R. 361).

consider.  See 20 C.F.R. § 404.1527(e)(1).  Walker and Brown provide little rationale for the marked and extreme functional limitations set forth in the form, for the most part citing only plaintiff's diagnoses as the "factors" supporting their opinion.  Although they identify these "factors" – i.e., chronic depression, anxiety and panic attacks – as "longstanding," they do not offer any opinion regarding the date on which the limitations they identified first existed. Their response to the question seeking this opinion – that plaintiff was abused by her brother at the age of six and by her first husband – cannot fairly be read to indicate that the extreme limitations existed at age six or during plaintiff's first marriage; it is simply non-responsive to the query.  As noted above, the additional treatment records reflect a decline in plaintiff's mental status after her date last insured. The undated form was submitted to the Appeals Council on December 7, 2009 (see R. 375); there is no indication that the opinions expressed on the form relate to the period before plaintiff's date last insured.

Upon its review of the record as a whole, the court concludes that the evidence of plaintiff's continued treatment by SCAMH and the medical source opinion do not render the Commissioner's decision denying benefits erroneous.  Accordingly, the Appeals Council did not err by denying review.

## CONCLUSION

Upon consideration of the administrative record, and plaintiff's allegations of reversible error, the court concludes that the decision of the Commissioner is due to be AFFIRMED.  A separate judgment will be entered.

DONE, this 27th day of March, 2012.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE